UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JOHN WAGNER,

                   Plaintiff,

          v.

PAUL A. JAMIESON, and SENNHEISER
ELECTRONIC CORP.,

                   Defendant.

**MEMORANDUM AND ORDER**

18-cv-05723 (LDH)

---

LaSHANN DeARCY HALL, United States District Judge:

John Wagner ("Plaintiff") brings the instant action against Paul Jamieson and Sennheiser

Electronic Corporation ("Sennheiser" or, together with Jamieson, "Defendants"), seeking

recovery pursuant to New York State's No-Fault Insurance Law for personal injuries allegedly

sustained in a car accident.  Defendant Sennheiser moves to dismiss pursuant to Rule 56 of the

Federal Rules of Civil Procedure for summary judgment.

### UNDISPUTED FACTS[1]

**I.   Defendant Jamieson**

In 2016, Defendant Jamieson was employed by Defendant Sennheiser as its Northeast

Area Business Development Manager.  (Pl.'s Resp. to Def. Sennheiser's 56.1 Statement ("Pl.'s

Resp. 56.1") ¶ 45, ECF No. 37; Def. Jamieson's Resp. to Def. Sennheiser's 56.1 Statement

---

[1] Unless otherwise indicated, the undisputed facts are taken from the parties' statements of material facts and annexed exhibits pursuant to Local Rule 56.1.  To the extent any fact is disputed, it is so indicated.  Facts that are not contradicted by citations to admissible evidence are deemed admitted.  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("[i]f the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").  Further, the Court does not consider arguments and legal conclusions contained in the parties' 56.1 statements.  *See, e.g.*, *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions[.]") (emphasis omitted), *aff'd*, 56 F. App'x 27 (2d Cir. 2003).

("Jamieson Resp. 56.1") ¶ 46, ECF No. 48.)  In this role, Defendant Jamieson managed a territory in the northeast and traveled to visit his customers in that area.  (Philip C. Semprevivo, Esq. ("Semprevivo Decl."), ECF No. 40; Ex. D ("Jamieson Dep.") at 8:10–16, ECF No. 40-5[2].)  Defendant Jamieson resided in Massachusetts and travelled to the New York and New Jersey areas to meet with customers.  (Pl.'s Resp. 56.1 ¶ 46; Jamieson Resp. 56.1 ¶ 47; Semprevivo Decl., Ex. D at 8:21–23.)

During the week of October 18, 2016, Defendant Jamieson traveled to New York for meetings in the tristate area.  (Sennheiser Decl., Ex. D at 8:17–9:9.)  Defendant Jamieson had a meeting on October 20, 2016, and stayed overnight at a hotel in New Jersey that evening.  (Pl.'s Resp. 56.1 ¶¶ 47–48; Jamieson Resp. 56.1 ¶¶ 48–49.)  On October 21, 2016, Defendant Jamieson planned to stop at an event held by Sennheiser in lower Manhattan on his way home to Massachusetts (the "Oculus" event).  (Pl.'s Resp. 56.1 ¶ 49; Jamieson Resp. 56.1 ¶ 50.)  The event was not mandatory for Defendant Sennheiser employees; Defendant Jamieson, however, wanted to attend because he was in the area.  (Semprevivo Decl., Ex. D at 22:20-23:7.)

## II.   The Car Accident

On October 21, 2016, Defendant Jamieson was driving in the Brooklyn Bridge Tunnel on his way to the Oculus event.  (Pl.'s Resp. 56.1 ¶¶ 1, 49; Jamieson Resp. 56.1 ¶ 1; Semprevivo Decl., Ex. D at 24:21-25.)  Plaintiff was driving in the opposite direction.  (Pl.'s Resp. 56.1 ¶ 5; Jamieson Resp. 56.1 ¶ 5.)  At approximately 12:00 p.m., Plaintiff and Defendant Jamieson were involved in a car accident, which Plaintiff contends was caused by Defendant Jamieson (the "Accident").  (Pl.'s Resp. 56.1 ¶ 6; Jamieson Resp. 56.1 ¶ 6.)  The airbags did not deploy in either car upon collision, and the car windows remained intact.  (Pl.'s Resp. 56.1 ¶ 7; Jamieson

---

[2] Any citation to exhibits attached to Philip Semprevivo's Declaration reference ECF No. 40.

Resp. 56.1 ¶ 7.)  Plaintiff drove his vehicle out of the Brooklyn Bridge Tunnel and to a nearby

police station.  (Pl.'s Resp. 56.1 ¶ 8; Jamieson Resp. 56.1 ¶ 8.)  At the police station, Plaintiff

declined an offer to call an ambulance.  (Pl.'s Resp. 56.1 ¶ 11.)

### III.  Plaintiff's Medical History

Prior to the Accident, on June 25, 2014, Plaintiff had an MRI exam of his spine, which

showed, *inter alia*, multilevel degeneration and posterolateral right sided disc herniation that

compressed his distal thoracic spinal cord.  (Pl.'s Resp. 56.1 ¶ 24.)  In the same year, Plaintiff

had difficulty walking, using stairs, and getting into and out of a car because of pain in his left

leg.  (*Id.* ¶ 25.)  Plaintiff further reported difficulty with performing daily activities, such as

household chores and his ability to concentrate.  (*Id.* ¶ 26.)  After receiving three rounds of

"nerve root block" injections, one on July 9, 2014, and two around March 2016, Plaintiff claims

the pain in his leg "completely resolved" as did the interferences caused in his personal life.  (*Id.*

¶¶ 25–26.)

Three days after the Accident, on October 24, 2016, Plaintiff received medical care at an

emergency room.  (*Id.* ¶ 12.)  Plaintiff complained of pain in his upper neck, lower back, and left

wrist.  (Semprevivo Decl., Ex. E ("2016 Danbury Record") at 2, ECF No. 40-6-.)  At the

emergency room, Plaintiff underwent a CAT scan, which showed evidence of "significant spinal

stenosis."  (*Id.* at 6.)  Plaintiff also underwent X-ray imaging of his spine, which showed a large

osteophyte on Plaintiff's lumbar spine area, endplate spurring on his lumbar spine, and mid loss

of height of his T12 vertebrae.  (*Id.*)  The X-ray results for Plaintiff's lumbar spine were

summarized as reflecting "degenerative disease," the age of which was deemed "indeterminate."

(*Id.*)  The records also indicated that there was no evidence of a cervical spinal injury.  (*Id.*)

Finally, with respect to Plaintiff's left wrist, an X-ray from that day confirmed that Plaintiff's

alignment was normal and that he had no soft tissue swelling in his wrist.  (*Id.*)  The emergency
room physician concluded that Plaintiff's CT scans and X-ray "[were] within normal limits."
(*Id.* at 7.)  Ultimately, Plaintiff was prescribed Tramadol and was discharged from the
emergency room that same day.  (*Id.*)

On October 28, 2016, Plaintiff visited orthopedist Dr. Daniel Fish.  (Semprevivo Decl.,
Ex. F ("Fish Records") at 8–9, ECF No. 40-7.)  Dr. Fish noted that Plaintiff "sustained a
significant sprain of his left wrist," reported pain "in the sacrolliac joint," and displayed signs of
a "whiplash injury to [his] cervical spine."  (*Id.* at 9.)  Plaintiff was prescribed Ambien and
cortisone injections for his joint pain.  (*Id.*)  Plaintiff returned to Dr. Fish a couple of weeks later,
on November 10, 2016.  (*Id.* at 5.)  At that time, Dr. Fish indicated no abnormalities during
Plaintiff's musculoskeletal exam and noted improvement with respect to Plaintiff's neck, back,
and left wrist pain.  (*Id.* at 6.)  According to Dr. Fish's notes, Plaintiff reported feeling "quite
stiff" in the neck, had "some left-sided flank muscular pain," and could use his wrist only
sparingly.  (*Id.*)  Dr. Fish recommended that Plaintiff undergo physical therapy.  (*Id.*)

Plaintiff received physical therapy from November 2016 until May 2017.  (Pl.'s Resp.
56.1 ¶ 18.)  During his first session in November 2016, Plaintiff's physical therapist noted that
Plaintiff received a 62% on the "Oswestry Low Back Disability Index," and classified his range
of motion as reflecting "[s]evere impairment." (Semprevivo Decl., Ex. G ("PT Records") at 15,
ECF No. 40-8.)  The therapist noted that Plaintiff "present[ed] with signs and symptoms
consistent with . . . cervical and lumbar strain [from] being involved in a [motor vehicle
accident[.]]"  (*Id.* at 18.)  Plaintiff contends he was informed his no-fault benefits were to be
terminated on or about June 17, 2017, and, as a result, he could no longer afford physical
therapy.  (Plaintiff's Declaration ("Pl.'s Decl.") ¶¶ 5, 6, ECF No. 36.)  Because of his inability to

pay out of pocket and because, as Plaintiff reports, physical therapy did not help alleviate his symptoms, Plaintiff stopped attending physical therapy in May 2017.  (*Id.* ¶ 7; Pl.'s Resp. 56.1. ¶ 18.)

After his last physical therapy session, Plaintiff did not seek medical care again until November 2018, a month after commencing this litigation.  (Pl.'s Resp. 56.1. ¶ 19.)  In November 2018, Plaintiff saw neurologist Dr. Aric Hausknecht.  (*Id.*)  During this visit, Dr. Hausknecht noted that Plaintiff "has a prior history of lower back problems" and "pre-existing osteoarthritis."  (Semprevivo Decl., Ex. H ("Hausknecht Records") at 4, 11, ECF No. 40-9.)  Dr. Hausknecht concluded "[w]ith a reasonable degree of medical certainty, [Plaintiff] has sustained permanent consequential limitation of use of his cervical and lumbosacral spine[.]"  (*Id.*)  The doctor further concluded "[w]ith a reasonable degree of medical certainty," the "motor vehicle accident of 10/21/16" was "the substantial cause of his condition."  (*Id.*)  Plaintiff saw Dr. Hausknecht again on December 7, 2018, and underwent a cervical spine MRI exam. (Semprevivo Decl., Ex. I ("Dr. Aric Hausknecht MRI") at 3, ECF No. 40-10.)  The MRI results showed "[n]o fractures" but disc herniations at several points in Plaintiff's spine, a disc bulge at one point, and spinal stenosis.  (*Id.* at 4.)

On May 15, 2019, upon the request of Defendant Jamieson and former Defendant Ean Holding, LLC, Plaintiff underwent an independent medical exam by neurosurgeon Dr. Kathryn Ko.  (Pl.'s Resp. 56.1 ¶ 28.)  Dr. Ko performed a neurosurgical exam on Plaintiff and reviewed his medical history.  (Semprevivo Decl., Ex. M ("Ko Report") at 4–7, ECF No. 40-14.)  Dr. Ko diagnosed Plaintiff with an ongoing cervical spine herniated disc and lumbar spine herniated disc.  (*Id.* at 10.)  Dr. Ko concluded these conditions "are causally related" to the Accident but noted that Plaintiff had "pre-existing cervical and lumbar degenerative disc disease."  (*Id.*)  Dr.

5

Ko recommended additional epidural injections and suggested that Plaintiff may require surgery for his conditions. (*Id.*)

On July 11, 2019, Plaintiff underwent a second independent medical exam by orthopedic surgeon Dr. Dorothy Scarpinato. (Semprevivo Decl., Ex. N ("Scarpinato Report") at 4–7, ECF No. 40-15.) Dr. Scarpinato reviewed Plaintiff's medical history and performed a physical exam of Plaintiff. (*Id.*) With respect to the physical exam, she noted normal range of motion for Plaintiff's cervical and lumbar spine regions. (*Id.* at 5.) While Dr. Scarpinato indicated that the exam "reveal[ed] a subjective complaint of back tenderness," she concluded that this complaint was not supported by "positive objective findings." (*Id.* at 6.) Dr. Scarpinato ultimately determined that "there is no medical necessity for any further orthopedic treatment including physical therapy for any examined areas" and diagnosed Plaintiff with "resolved cervical spine strain and resolved lumbar spine strain." (*Id.*) She further concluded "there is no causal relationship between [Plaintiff's] pre-existing degenerative disc disease in the cervical and lumbar spine" and the Accident. (*Id.*) Although, Dr. Scarpinato found that Plaintiff's resolved soft tissue sprain and strain are "related" to the Accident. (*Id.*) Dr. Scarpinato noted no "orthopedic disability or permanency." (*Id.*)

Between 2019 and 2020, Plaintiff underwent two spinal surgeries, first on December 24, 2019, and then on June 11, 2020. (Pl.'s Resp. 56.1 ¶¶ 31, 32.) About a month after Plaintiff's second surgery, on July 29, 2020, orthopedic surgeon Dr. Joseph Weinstein completed a medical evaluation of Plaintiff. (*Id.* ¶ 92.) Dr. Weinstein reviewed Plaintiff's medical history and conducted a physical exam of Plaintiff. (Richard Abend Declaration ("Abend Decl."), ECF No. 35; Ex. F ("Weinstein Report") at 3–4, ECF No. 35-6.) Dr. Weinstein was unable to assess the range of motion for Plaintiff's cervical spine area because of Plaintiff's recent surgery. (*Id.* at 3.)

However, with respect to the range of motion for Plaintiff's lumbar spine area, Dr. Weinstein noted subpar mobility.  (*Id.*)  Dr. Weinstein concluded that Plaintiff "ha[d] sustained extensive injuries with permanent disability, to the cervical spine and lumbar spine" and that these injuries were "causally related to [the Accident.]"  (*Id.*)

On September 23, 2020, Dr. Sheldon Feit, a certified radiologist, conducted an independent radiology review of Plaintiff's medical records. (Pl.'s Resp. 56.1 ¶ 33.)  Dr. Feit concluded that Plaintiff suffered from multilevel degenerative disc disease with disc bulges at several points, degenerated spondylosis, and a small herniation.  (Semprevivo Decl., Ex. P ("Feit Report") at 6–7, ECF No. 38-17.)  Dr. Feit further concluded that Plaintiff's disc bulges "are not post-traumatic but are degenerative," as are Plaintiff's small spinal herniation and osteophyte formations.  (*Id.* at 7.)  Dr. Feit found that the worsening of Plaintiff's condition "most likely related to the passage of time."  (*Id.*)  Ultimately, Dr. Feit determined that "[t]here are no abnormalities causally related" to the Accident.  (*Id.*)

On September 30, 2020, Dr. Hausknecht completed an exam report for Plaintiff.  (Abend Decl., Ex. G ("Hausknecht"), ECF No. 35-7.)  Dr. Hausknecht reviewed Plaintiff's medical history after the Accident and Plaintiff's June 25, 2015 MRI results.  (*Id.* at 2–6.)  Dr. Hausknecht determined that Plaintiff had the following conditions: cervical derangement, disc herniation, and disc bulges in Plaintiff's cervical and lumbar spine areas as well as "aggravation of Plaintiff's underlying degenerative joint disease and prior lower back condition."  (*Id.* at 6.)  Dr. Hausknecht concluded "[w]ith a reasonable degree of medical certainty" that Plaintiff "sustained consequential limitation of the use of his cervical and lumbosacral spine," which were "causally related to the [Accident]."  (*Id.*)

Plaintiff underwent a third independent medical exam on October 18, 2020, this time by orthopedic surgeon Dr. Jarden Brandoff.  (Pl.'s Resp. 56.1 ¶ 39.)  Dr. Brandoff reviewed Plaintiff's medical records and conducted a physical exam of Plaintiff.  (Semprevivo Decl., Ex. Q ("Brandoff Report") at 1, ECF No. 40-18.)  Dr. Brandoff noted a subpar range of motion for Plaintiff's lumbar spine but otherwise "a rather normal physical examination."  (*Id.* at 11.)  Dr. Brandoff diagnosed Plaintiff with resolved cervical and lumbar spinal strains.  (*Id.*)  With respect to Plaintiff's lumbar spine, Dr. Brandoff noted Plaintiff's "history of severe lumbar disc disease and severe stenosis," which were "clearly documented . . . far earlier" than the Accident.  (*Id.*)  He concluded that "[t]here is no evidence of acute structural injury to [Plaintiff's] lumbar spine[,]" and that Plaintiff had "significant congenital stenosis . . . [that] is not in any way causally related to the [Accident]."  (*Id.* at 12.)  However, Dr. Brandoff noted that Plaintiff experienced a "causally-related lumbar sprain, which universally resolves shortly after the accident with appropriate care."  (*Id.*)  With respect to Plaintiff's cervical spine region, Dr. Brandoff noted Plaintiff had no pre-Accident imaging studies completed.  (*Id.* at 13.)  But, he determined there was "no suggestion of acute injury on imaging studies" completed after the Accident.  (*Id.*)  Dr. Brandoff further concluded that, "given the amount of lumbar degenerative disease" Plaintiff exhibited prior to the Accident, "it is highly likely that cervical degenerative disease also existed prior to [the Accident.]."  (*Id.*)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *See Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts, *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

### I.   Claim Pursuant to New York Insurance Law

"In 1973, the New York State Legislature passed the precursor to today's Comprehensive Motor Vehicle Insurance Reparations Act, . . . supplanting the state's common law tort remedies for most injuries associated with automobile accidents with a no-fault insurance scheme." *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 372 F.3d 500, 502 (2d Cir. 2004) (citation omitted), *certified question answered sub nom.*, 827 N.E.2d 758 (2005). "A major objective of New York's no-fault insurance law is to eliminate most auto accident tort suits in order to reduce the burden on courts." *Rosa v. Allstate Ins. Co.,* 981 F.2d 669, 676 n.15 (2d Cir. 1992). Accordingly, New York's "No–Fault" law allows recovery for non-economic loss arising out of negligence in the use or operation of an automobile only where the claimant has suffered a "serious injury." N.Y. Ins. Law § 5102(c) and (d).

To be entitled to summary judgment, it is a defendant's burden "to put forward sufficient evidence that the plaintiff did not suffer [a] 'serious injury'" caused by the accident. *Yanez v. City of New York*, 29 F. Supp. 2d 100, 113 (E.D.N.Y. 1998) (citing *Hoffman v. Nogaro*, 667 N.Y.S.2d 943 (App. Div. 1998)); *see also Evans v. United States*, 978 F. Supp. 2d 148, 163 (E.D.N.Y. 2013) (collecting cases). If the defendant does not satisfy this burden, the plaintiff is not required to come forward with proof that plaintiff suffered a serious injury. *Cf. Gaddy v. Eyler*, 79 N.Y.2d 955 (N.Y. 1992). If the defendant meets this burden, "the burden then shift[s] to [the] plaintiff to come forward with sufficient evidence to overcome defendant's motion by demonstrating that [he] sustained a serious injury within the meaning of the No-Fault Insurance Law." *Id.* at 957 (citation omitted).

Here, Defendant Sennheiser maintains that Plaintiff has not established a serious injury because Plaintiff ceased treatment between May 2017 and November 2018. (Sennheiser Def.'s Mem. Supp. Summ. J. ("Sennheiser's Mem.") at 16–17, ECF No. 41.) It is true under New York law that a significant gap in treatment is indicative of whether a Plaintiff suffered a serious injury and of causation. *See Pommells v. Perez*, 4 N.Y.3d 566, 574 (N.Y. 2005) (affirming grant of summary judgment where a plaintiff provided no explanation for ending physical therapy six months after the accident). The New York Court of Appeals has found a "reasonable explanation" to exist where a Plaintiff testifies to exhausting his no-fault insurance and not being able to afford treatment out of pocket. *See Ramkumar v. Grand Style Transp. Enterprises Inc.*, 998 N.E.2d 801, 802 (N.Y. 2013). Similar facts are present in this case. Plaintiff submitted an affidavit explaining that he understood his no-fault coverage was to expire in June 2017 and that he could not otherwise afford to pay for further physical therapy. (Pl.'s Decl. ¶¶ 5–6.) Defendants offer no evidence to dispute these assertions by Plaintiff. Accordingly, the Court

10

finds that "[P]laintiff has come forward with the bare minimum required to raise an issue regarding 'some reasonable explanation' for the cessation of physical therapy." *Ramkumar*, 998 N.E.2d at 802 (citation omitted).[3]  This does not end the Court's inquiry.

Defendant Sennheiser also argues that, even if Plaintiff had established a serious injury, Plaintiff cannot establish that his injuries were caused by the Accident.  (Sennheiser Mem. at 19.) On this argument, Defendant Sennheiser fares better.  Defendant directs the Court to Plaintiff's 2014 MRI results, the treatment notes from Plaintiff's 2016 visit to the emergency room a few days after the Accident, as well as reports from Drs.  Ko, Scarpinato, Brandoff, and Feit, who each reach the same conclusion—Plaintiff suffered from degenerative spinal conditions prior to the Accident and displayed signs of osteophytes and disc disease as far back as 2014.  (*See generally* 2014 MRI Results, Danbury Records, Ko Report, Scarpinato Report, Brandoff Report, Feit Report.)  Indeed, Plaintiff's own expert Dr. Hausknecht concluded that Plaintiff had a history of "lower back problems" and "pre-existing osteoarthritis."  (Semprevivo Decl., Ex. H at 11.)  Having proffered multiple reports indicating Plaintiff had multilevel disc disease, osteophytes on his spine, and degenerative disc disease that pre-dated the Accident, Defendant Sennheiser has met its burden.  *See, e.g.*, *Wang v. Levy*, 190 A.D. 3d 469 (App. Div. 2021) (Defendants established prima facie that plaintiff did not suffer a serious injury to his lumbar spine by "submitting plaintiff's MRI report of his lumbar spine and the report of their orthopedic surgeon, who opined that the conditions identified in the MRI report, including osteophytes, were indicative of chronic multilevel disc disease, which preexisted the subject motor vehicle

---

[3] Defendant Sennheiser argues that Plaintiff's explanation is unpersuasive and should be rejected by the Court because Plaintiff indicated he had other insurance at the time he ceased treatment.  (Def.'s Reply at 6, ECF No. 54.) Defendant's only factual support for this argument, however, at most reveals that Plaintiff had other insurance in October 2016.  (Danbury Record at 1; Pl.'s Resp. 56.1 ¶¶ 12, 58.)  Defendant Sennheiser provides no support for its contention that Plaintiff had other insurance in May 2017, when Plaintiff stopped receiving physical therapy.

accident."); *Kerr v. Klinger*, 71 A.D.3d 593, 896 N.Y.S.2d 868, 868–69 (App. Div. 2010)

("Defendant established [ ] prima facie entitlement to summary judgment by submitting . . . the

affirmed reports of a radiologist, who, upon reviewing the MRI films taken after plaintiff's

accident, concluded that the disc bulges and/or herniations revealed therein were the result of

degenerative disc disease and not caused by the automobile accident").  The burden thus shifts to

Plaintiff to establish through objective evidence a triable issue of fact with respect to whether his

alleged injuries were caused by the Accident.  "As long as the plaintiff adduces sufficient

objective evidence from which a jury could find that []he sustained a serious injury, summary

judgment must be denied 'notwithstanding some contrary probative evidence.'"  *Evans*, 978 F.

Supp. 2d at 163 (citation omitted).  The Court is not convinced that Plaintiff has met that burden.

    As best as can be discerned, Plaintiff maintains that he suffered a "serious injury"[4] in the

form of permanent consequential or significant limitation of the use of his back.[5]  (Pl.'s Opp'n

Mem. Summ. J. ("Pl.'s Opp'n") at 5, 19, ECF No. 46.)   To establish a permanent consequential

limitation, "it was incumbent upon plaintiff to demonstrate more than 'a mild, minor or slight

limitation of use.'" *Booker v. Miller*, 258 A.D.2d 783, 784 (App. Div. 1999) (quotation marks

and citations omitted).  Conversely, to establish a "significant limitation of use of a body

---

[4] Under the New York No–Fault Insurance Law,§ 5102(d), "Serious Injury" is defined as follows:

> A personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss
> of a fetus; permanent loss of use of a body organ, member, function or system; permanent
> consequential limitation of use of a body organ or member; significant limitation of use of a body
> function or system; or a medically determined injury or impairment of a non-permanent nature
> which prevents the injured person from performing substantially all of the material acts which
> constitute such person's usual and customary daily activities for not less than ninety days during the
> one hundred eighty days immediately following the occurrence of the injury or impairment.

*Id.* § 5102(d).

[5] Though Plaintiff does not explicitly specify which clause or clauses of the "serious injury" statute are applicable to
his injuries nor does Plaintiff specify which body part has been impacted.  Plaintiff's briefing emphasizes the
permanent consequential limitation and significant limitation of use clauses with respect to his spinal conditions.
(Pl.'s Opp'n Mem. Summ. J. ("Pl.'s Opp'n") at 6, 19, ECF No. 46.)

function," permanence need not be shown, but at a minimum, the "dysfunction" must be one

"important enough to reach the level of significance." *Miller v. Miller*, 100 A.D.2d 577, 578

(App. Div. 1984) (emphasis omitted).  For either category, "more than a mild, minor or slight

limitation of use" must be demonstrated.  *Booker*, 258 A.D.2d at 784 (citation omitted)

(considering permanent limitations); *Licari v. Elliott*, 57 N.Y.2d 230, 236 (N.Y. 1982) (stating

the same for the significant limitation of use category).  And, for either category, a causal link

between the accident and the injuries must be established.  *See Pommells*, 4 N.Y.3d at 574–79

(analyzing both categories together and determining that a plaintiff must show causation for

both).  Plaintiff has failed to adduce sufficient evidence establishing causation.

   Plaintiff's medical experts offer no more than conclusory assertions that his injuries were

caused by the Accident.  Incredibly, Plaintiff's experts—with full knowledge of his present

conditions—make no attempt to explain the effect of his pre-existing degenerative conditions.

For example, Dr. Hausknecht concluded that Plaintiff "sustained consequential limitation of the

use of his cervical and lumbosacral spine," which are "causally related to the [Accident]."

(Semprevivo Decl., Ex. H at 11.)  Dr. Hausknecht acknowledged that Plaintiff had pre-existing

degenerative conditions but does not explain why Plaintiff's injuries are not reflective of his pre-

existing conditions instead of the Accident.  Similarly, Dr. Ko noted Plaintiff's pre-existing

conditions but states in conclusory terms that Plaintiff's spinal conditions were "causally related"

to the Accident.  (Semprevivo Decl., Ex. M at 10.)  Dr. Ko does not explain why Plaintiff's pre-

existing conditions can be ruled out as the cause of Plaintiff's limitations.  Similarly, Dr.

Weinstein reviewed Plaintiff's medical history and stated in conclusory terms that Plaintiff's

injuries are "causally related" to the Accident.  (Abend Decl., Ex. F at 3.)  Like Dr. Ko, Dr.

Weinstein does not address why Plaintiff's pre-existing conditions can be ruled out as the cause

of Plaintiff's injuries.  Without more, Plaintiff cannot meet his burden.  Indeed, New York courts

routinely find that a plaintiff has not met his burden where, like here, his medical experts fail to

explain why pre-existing conditions are ruled out as the cause of any alleged limitations.  *See,*

*e.g.*, *Pommells*, 4 N.Y.3d at 574 (summary judgment proper where "plaintiff failed to address the

effect of his kidney disorder on his claimed accident injuries"); *Rodriguez v. Morel*, 157

N.Y.S.3d 725, 726 (App. Div. 2022) ("plaintiff failed to raise a triable issue of fact, as his

medical experts failed to explain why the pre-existing conditions in plaintiff's spine and left

shoulder were ruled out as the cause of his alleged limitations and they provided only conclusory

assertions that his injuries were caused or aggravated by the subject accident"); *Wang*, 190

A.D.3d at 647 (N.Y. Ct. App. 1st Dept. 2021) (plaintiff failed to raise issue of fact as to

causation where none of his physicians addressed evidence of preexisting conditions of

multilevel disc disease); *cf. Arenes v. Mercedes Benz Credit Corp.*, No. 03-CV-5810, 2006 WL

1517756, at *9 (E.D.N.Y. June 1, 2006) ("[plaintiff's expert] does not explicitly address

[defendant's expert's] findings that plaintiffs' injuries are the result of a preexisting,

degenerative condition. Although [plaintiff's expert] states that both plaintiffs' injuries are

causally related to the Accident, she does not explain what leads her to that finding.  Her

conclusory statements are not sufficient to demonstrate a triable issue of fact.").  Defendant

Sennheiser's motion for summary judgment is granted.

## II.    Respondeat Superior

"Under the doctrine of respondeat superior, an employer will be liable for the negligence

of an employee committed while the employee is acting in the scope of his employment."

*Lundberg v. State of New York*, 25 N.Y.2d 467, 470 (N.Y. 1969).  "An employee acts in the

scope of his employment when he is doing something in furtherance of the duties he owes to his

employer and where the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities." *Id.* "As a general rule" under New York law, "an employee driving to and from work is not acting in the scope of his employment." *Id.* at 471. That is because "the element of [an employer's] control is lacking." *Id.* However, an exception to this rule exists where an employee "is under the control of his [ ] employer from the time that the employee enters his [ ] vehicle at the start of the workday until the employee leaves the vehicle at the end of the workday as in the case, for example, of a traveling salesperson or repairperson." *Swierczynski v. O'Neill*, 41 A.D.3d 1145, 1147 (N.Y. Ct. App. 4th Dept. 2007). "Where travel is part of the employment, the crucial test is whether the employment created the necessity for the travel." *Carlson v. Am. Int'l Grp., Inc.*, 30 N.Y.3d 288, 305 n.6 (N.Y. 2017) (quotation marks and citation omitted). Even where travel is a regular part of an employee's job, however, appellate courts in New York have found an employee not to be acting within the scope of employment when the alleged conduct occurs after the employee is allowed to leave for the day. *See, e.g.*, *Swierczynski v. O'Neill*, 41 A.D. 3d 1145, 1147 (N.Y. Ct. App. 4th Dept. 2007) ("At the time of the accident, O'Neill had received permission from her supervisor to leave for the day following her last field appointment. Once she received that permission, she was no longer acting in furtherance of any duty that she owed to defendant and was no longer under defendant's control.").

The Court finds instructive the New York Appellate Department's opinion in *Wood v. Brownlee*, 188 A.D.3d 1713 (App. Div.2020). In *Wood*, a collision occurred when the defendant-employee was driving home from a corporate meeting held by defendant-employer. *Id.* at 1715. The employee testified that he intended to stop at his employer's facility before returning home and argued that, as a result, he was acting within the scope of his employment.

*Id.* The employee, however, was not required to stop at the facility, nor had his employer ordered him to perform any other act once the meeting he attended ended. *Id.* The Appellate Division found that as a matter of law the employee was not acting within the scope of his employment at the time of the accident. *Id.* The court stated that "[t]he fact that the corporate meeting was held at a location other than [the employee's] typical place of work does not alter our analysis, nor does the fact that [the employee] was reimbursed for travel expenses." *Id.* The same principle applies here. Defendant Jamieson had finished his meetings when the Accident occurred and was under no obligation to attend the Oculus event. (Semprevivo Decl., Ex. D at 22:12–23:7.) Put simply, Plaintiff cannot establish that Defendant Sennheiser had control over Defendant Jamieson's actions at the time of the Accident. Accordingly, the Court finds that Defendant Jamieson was not acting within the scope of his employment. As a result, Defendant Sennheiser cannot be held vicariously liable for his conduct under the doctrine of respondeat superior. Defendant Sennheiser's motion for summary judgment with respect to respondeat superior is granted.[6]

## CONCLUSION

For the foregoing reasons, Defendant Sennheiser's motion for summary judgment is GRANTED. Because the Court finds that Plaintiff has not put forward sufficient evidence to establish a "serious injury" under New York law, Plaintiff is ORDERED TO SHOW CAUSE by October 31, 2022, as to why this case should not be dismissed with respect to Defendant Jamieson for the same reason.

---

[6] The cases Plaintiff and Defendant Jamieson cite are inapposite. For example, *Zwibel v. Midway Auto. Grp.*, involved an employee who worked as a valet and was driving at the direction and with the permission of his employer. 127 A.D.3d 965, 966–67 (App. Div. 2015). And, *Camisa v. Rosen* involved an employee who was driving while on a call with a vendor when the accident occurred. 150 A.D.3d 809, 810 (N.Y. App. Div. 2017). Finally, in *Kelly v. Starr*, the employee was driving his employer's car and was on the way to perform a work-related duty when the accident occurred. 181 A.D.3d 799, 801 (N.Y. App. Div. 2020). No similar facts are present here.

SO ORDERED.

Dated: Brooklyn, New York          /s/ LDH
       September 29, 2022          LASHANN DEARCY HALL
                                     United States District Judge